James Quince Whittemore v. Commissioner.
Whittemore v. Commissioner
Docket No. 13421.
United States Tax Court
1948 Tax Ct. Memo LEXIS 38; 7 T.C.M. (CCH) 845; T.C.M. (RIA) 48243; November 16, 1948
*38 Petitioner realized income during the taxable years 1942 to 1945 primarily from the operation of a bar and package store, for which business he maintained a complete set of books and records. Respondent rejected the petitioner's tax returns which were substantially in accord with these records and determined the deficiencies herein on the basis of the petitioner's bank deposits, withdrawals, and a so-called net worth statement. Held, that the business records kept by petitioner accurately reflect his income for the taxable years involved and that his income tax returns, which were substantially based upon these books, disclose his full tax liability for each of the taxable years in issue. Held, further, that no part of any deficiency determined for the taxable years involved herein is due to fraud with intent to evade tax. Joseph Hartman, Esq., 302 Roberts Bldg., Jacksonville, Fla., and John E. Teate, Esq., Barnett Bank Bldg., Jacksonville, Fla., for the petitioner. Edward L. Potter, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion This proceeding involves deficiencies in Federal income tax for the calendar years 1942 to 1945, inclusive, in the total amount of $41,272.18, and fraud penalties in the amount of $20,438.21. The deficiencies determined by the respondent for the years involved are as follows: Year
Amount
1942
$ 4,783.21
1943
2,678.41
1944
13,274.75
1945
20,535.87
Total
$41,272.18
50% Fraud Penalties
$20,438.21
Respondent rejected the petitioner's tax returns which were substantially in accord with his books upon the ground that his books did not accurately reflect his income for the taxable years in question. Pursuant to section 41 of the Internal Revenue Code, the respondent determined the deficiencies herein on the basis of petitioner's bank deposits and withdrawals and net worth. He also determined that the petitioner is subject to the 50 per cent fraud penalty imposed pursuant to section 293(b) of the Internal Revenue Code *40 . Findings of Fact The petitioner, James Quince Whittemore, is an individual residing in Jacksonville, Florida. His income tax returns for the years 1942 to 1945, inclusive were filed with the colector of internal revenue for the district of Florida at Jacksonville, Florida. Petitioner started in business in Callahan, Nassau County, Florida, in the timber and building business during the year 1909. In 1914 he purchased a drugstore at Callahan which he sold in 1922 for a price of approximately $10,000. Shortly before petitioner sold the drugstore he built a hotel at a cost of approximately $11,000 which he finished paying for in 1926. He operated this hotel from 1922 to 1926, at which time he turned it over to his wife, receiving personally out of the transaction $2,500. Petitioner later purchased a restaurant in the bus station in Jacksonville, Florida, for $3,000 and entered the taxicab business. Petitioner sold this business and purchased another hotel which he operated under the name of the "Quincy Willow." During the taxable years in question petitioner operated a business known as the Clyde Bar. In 1936 the petitioner purchased this business which was known at that time *41 as Wood's bar from Mrs. Wood for approximately $5,000. Petitioner paid approximately $2,000 of the purchase price at the time of the transaction and paid the remainder over a period of several years thereafter. Petitioner had managed this business for Mrs. Wood from 1934 until the time he acquired the business in 1936. The entire establishment, which was known as the Clyde, consisted of two bars, a package store, a coffee shop, a smoke shop, and a barbershop. The coffee shop and barbershop were operated by parties who paid the petitioner a rental based upon a percentage of their profits. The petitioner paid the Everett Holding Company, the lessor of the premises, a rental of 5 per cent of the gross sales of the combined businesses. Petitioner had been practically blind since 1930. Until 1938 he managed, in spite of this handicap, to devote all of his time to the business. In 1938 his eyesight failed to a considerable extent and in 1942 he underwent the first of a series of operations that necessitated long absences from the business during the taxable years involved. A number of persons were employed by the petitioner in the operation of his business at the Clyde, including a *42 manager, a saleslady in the package store, and several bartenders. The manager, Mr. Mootz, was employed by the petitioner in 1936 and handled the business until his death in 1945. In both the package store and the bar, each employee rang up his sales on a separate cash register. Before an employee went off duty, the contents of his register were checked and a daily report was filed, together with the cash register tape and any invoices which represented purchases of beer or wine made during the day by that employee. Daily reports of gross sales were also submitted by the operators of the coffee shop and barbershop. These daily reports were filed by Mr. Mootz, the manager, together with a cumulative daily report of his own covering the entire business. These reports were turned over to Mr. Mewborn who was employed part time by the petitioner as a bookkeeper. Mewborn would allow these daily reports to accumulate until the last few days of the month, when he would analyze them and enter them in the journal. Petitioner kept no personal records. All invoices for whiskey were paid by checks written by the bookkeeper, but all other purchases such as beer and wine were paid from cash receipts *43 taken from the cash register. The invoices were then turned over to the bookkeeper to be entered on the books. On December 1, 1945, petitioner sold a one-half interest in the Clyde Bar to Leon King for $27,500. Petitioner has been married and divorced twice. Petitioner has kept a safe deposit box at the Barnett National Bank in Jacksonville since 1928. He opened another safe deposit box at the Atlantic National Bank in December, 1945. Petitioner also maintained a checking account for the Clyde Bar, a savings account, and a personal checking account. Large sums of money in varying amounts from $10,000 to $15,000 were also held in the safe at the Clyde for the purpose of cashing checks for the Army, Navy, and shipyard personnel. In 1946 petitioner's tax returns for the years 1942 to 1945, inclusive, were investigated by the respondent's agents. During the examination of his books, the agents discovered an adjustment for the year 1942 in the amount of $14,335.37 which was recorded on the books as representing money expended from petitioner's personal funds for purchases of whiskey made in anticipation of a shortage of such merchandise because of the war. There was an entry debiting *44 suspense for $14,335.37 and crediting the investment account for a like amount with the following explanation: "This entry is necessary to close the suspense account J. Q. Whittemore affirms that in anticipation of a shortage of merchandise because of the war effort he paid for purchases of whiskey from his personal funds and no record was made of them * * *." This entry was signed personally by the petitioner. Petitioner's income tax returns as far back as 1936 were examined by the agents. These returns were not produced by either the respondent or the petitioner at this hearing. The agents investigated, petitioner's bank accounts and made transcripts of his bank balances in the various accounts and obtained from the petitioner his bank statements and checks. At this time, they examined petitioner's safe deposit box at the Atlantic National Bank. Petitioner's safe deposit box at the Barnett National Bank had been sealed by court order in connection with a pending divorce proceeding instituted by petitioner's wife, but with her acquiescence this box was opened and examined by the revenue agents. In the safe deposit boxes of the petitioner at the Barnett and Atlantic Banks there was *45 found $32,403 in cash, approximately $21,000 in U.S. Bonds, and cashiers' checks for $25,550. Petitioner's income tax return for each of the years in issue was prepared by his bookkeeper, Mr. Mewborn, who prepared these returns on the basis of the business records and submitted them to petitioner for his signature. Petitioner reported net income of $3,953.33 for the year 1942; $19,533.23 for 1943; $21,580.37 for 1944; and $40,885.90 for 1945. Petitioner's income tax returns for the years 1942 to 1945, inclusive, were sub stantially in accord with his books. Respondent determined the deficiencies in the instant case largely upon an analysis of the petitioner's bank accounts and on what he determined to be the increase in petitioner's net worth over the period 1942 to 1945. Respondent computed petitioner's total deposits in his various bank accounts for each of the taxable years in question. He then examined and classified the checks drawn on these accounts. From petitioner's books he ascertained the amounts drawn by the petitioner in cash and by check for living expenses. The business inventory at the Clyde at the end of each of the years 1941 to 1945, inclusive, was secured from *46 petitioner's tax returns for those years, as was the amount of allowable depreciation. Only three items were originally considered by respondent in determining petitioner's net worth as of December 31, 1941, i.e., $3,968.66, which represented the amount in the checking account of the Clyde Bar at that date, a home owned by petitioner valued at $7,100, and the business inventory of $12,976.72. Respondent concedes that U.S. Bonds of the value of $1,500 should have been included in his assets as of that time. Respondent attributed the $32,403 which was found in the safe deposit boxes of the petitioner in 1946 to income for the years 1944 and 1945. The amount of $12,961.20 was included in petitioner's net worth for 1944, and $32,403 was added to his net worth as of December 31, 1945. This allocation was based upon respondent's determination that this money represented that portion of the petitioner's gross sales which stemmed from a so-called nonprofit tax imposed upon whiskey sold by petitioner after April, 1944, and throughout 1945. When petitioner acquired the safe deposit box at the Barnett National Bank in 1928, he deposited therein $12,500 in cash which represented the proceeds *47 from the sale of the drugstore and hotel in Callahan, Florida. Petitioner increased this amount from time to time until on December 31, 1941, he had in the safe deposit box at the Barnett Bank cash in the amount of at least $30,000. On this same date he had cash in his safe at the Clyde Bar of not less than $10,000. Included in the $32,403 found in the safe deposit boxes early in 1946 was the sum of $4,700 which had been received by petitioner from his son-in-law during the period 1938 to 1945. The $4,700 was repaid by him to his son-in-law in cash during 1946. Petitioner had no substantial source of income during the taxable years 1942 to 1945, inclusive, other than from his business at the Clyde Bar. Petitioner's business records upon which the original tax returns were based substantially reflected income earned during the taxable years 1942 to 1945, inclusive, and the income taxes paid by petitioner constituted his full tax liability for those years. No part of the deficiencies determined for any of the taxable years involved was due to fraud with intent to evade tax. Opinion ARUNDELL, Judge: The deficiencies determined in this case result from respondent's total disregard *48 of petitioner's books and records and his use of what he terms the net worth method of determining income. Fraud penalties have also been found for each of the years before us. The evidence clearly establishes that petitioner's returns for the years 1942 to 1945, inclusive, were substantially in accord with his books. Indeed, respondent frankly concedes this to be true. Moreover, respondent is unable to point to any source of income in any substantial amount other than that flowing from the operation of the Clyde Bar and associated activities. There was produced on behalf of the petitioner a number of witnesses who had been employed during the taxable years as bartenders, clerks, bookkeepers, and managers and their testimony was unequivocal that all transactions were correctly recorded as they occurred. As a sale was made from the bar or in the package shop it was rung up on the cash register and the transaction was recorded on the register tape and a receipt was given to the customer. At the end of his day's work, each employee's daily receipts were checked against the total on his register and a daily report was filed. Daily reports were likewise filed by the operators of the *49 coffee shop and the barbershop. The manager, Mr. Mootz, made a daily report of his own covering the entire business for the day and filed all of the reports with Mr. Newborn, the bookkeeper, who in due time entered them upon the books Under such a system it would seem very difficult to juggle the books and records. But it appears that these daily reports and the complete books and records of petitioner's business were put at the disposal of respondent's agents who, as we have already stated, were unable to point to any substantial discrepancies or irregularities although there was one item in the amount of $14,353.37 the explanation of which did not apparently satisfy respondent's agents. The account books of petitioner carry in detail his explanation of this item, and we have set forth in our findings the information as it appears on the books which is to the effect that this sum represented an additional investment in the business by petitioner for the purpose of purchasing liquor. The fact that this item and the explanation of it is boldly set forth on the books leads us to accept the explanation as it appears. Nevertheless, it was this item, together with the finding in petitioner's *50 lock boxes of some $32,000 in cash, plus government bonds in the amount of $21,000, and cashiers' checks in the amount of $25,550, which caused respondent to disregard petitioner's books and to make his determination on the so-called net worth method. Petitioner offers two explanations for having such a large sum of cash in the lock boxes rather than in a bank; one, that his experience with banks during the depression had made him reluctant to keep too large sums in a bank, and the second reason was that he was having family difficulties and he felt that this money could be better concealed in a lock box than if on deposit in a bank. The fact that in spite of his efforts his wife had succeeded in having the lock box in the Barnett National Bank placed under seal tends to support petitioner's explanation. The main reason we are reluctant to accept respondent's method of determining income is the fact, as we have already stated, that he can point to no known source of income on the part of petitioner other than that which flowed from the Clyde business, and we are satisfied that the income from that venture was reported with substantial correctness. But there is another reason of equal *51 importance that throws discredit on respondent's method and that is his failure to determine with any degree of accuracy petitioner's net worth at the starting date of December 31, 1941. It would be absolutely necessary to know the amount of petitioner's net worth at the beginning of the taxable period before one could determine under a net worth basis a taxpayer's income for succeeding years. The testimony indicated that the government agents were of the opinion that the cash found in the lock boxes represented some so-called "non-profit" taxes which the petitioner had collected and had not accounted for. It appears that effective May 1, 1944, and continuing through December, 1945, there was a tax on whiskey which, while constituting a part of petitioner's cost, was not permitted to be included in the mark-up of his sales price under existing O.P.A. regulations. Being of the impression that this cash represented the "non-profits" tax which had not been accounted for, the agents spread this sum over the twenty-month period from May 1, 1944, to December 31, 1945, and included a proportionate amount in petitioner's income for each of the years. This was obviously wrong as the tax had *52 been collected from the customer and included in the gross sales of petitioner and there was no connection in fact between the cash in the box and the so-called "non-profits" tax. We do not think it necessary to discuss in detail the items making up respondent's net worth statement, but perhaps it should be stated that such a large item as the $25,550 in cashiers' checks was explained by petitioner by establishing that $18,000 of that sum was withdrawn by petitioner from the Clyde business and the additional $7,550 to make up the total of $25,550 was obtained by the sale of government bonds petitioner had on hand. As set forth in our findings, respondent likewise disregarded the fact that petitioner had on hand on December 31, 1941, large sums of cash, to wit, some $30,000 or $40,000. Petitioner has been in business since 1909 and his activities included such ventures as construction operations, the carrying on of a drugstore, the operation of hotels, taxicabs, etc. He lived during all of these years very frugally and saved his money. We are satisfied that his net worth was much greater on December 31, 1941, than the sum used by respondent as his starting point in the determination *53 of the several deficiencies here involved. For almost 18 years petitioner has been practically blind and during a large part of the taxable years he was away from the business and during that period had several operations on his eyes. As a consequence, he was forced to rely on and did rely very largely on his employees and managers in the actual operation of his business at the Clyde. The use of a method such as employed by respondent where there are no books and records, or where there is evidence that there has been some tampering with the books and records, or where a taxpayer is engaged in activities other than his regular business, may well be justified. But on the facts here produced, we think the respondent was not warranted in disregarding petitioner's books and records and employing the method he did employ in the determination of the deficiencies covering the years before us. On the facts of record as a whole, we are of the opinion that all of the income realized by petitioner during the years 1941 to 1945, inclusive, was recorded on the business records and that the income tax returns filed by petitioner upon the basis of these books accurately reflect the full tax liability *54 for those years. In view of our comments, the issue of fraud requires no further discussion. Decision will be entered under Rule 50.