ADOLFO VILANOVA MAYÉN, Plaintiff and Appellee, v. SECRETARY OF THE TREASURY, Respondent and Appellant.

No. 11588. Resubmitted June 4, 1961.—Decided June 26, 1961.

*José Trías Monge, Secretary of Justice,* and *Manuel J. Medina Aymat, Assistant Attorney General,* for appellant. *Juan A. Faría* for appellee.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

On March 3, 1953 the Secretary of the Treasury notified final deficiencies to taxpayer Adolfo Vilanova Mayén in relation to his income tax returns for the years 1943, 1946, 1947, 1948, and 1949. Vilanova appealed to the superior court and after the corresponding trial, judgment was rendered setting aside in part and affirming in part the deficiencies notified.

In the present appeal the Secretary requests that the judgment rendered be reviewed insofar as it set aside the deficiency upon rejecting the administrative determinations attributing to the taxpayer unreported income for the amounts of $51,516.80, $8,837.14, and $19,964.11 during the years 1943, 1946, and 1948, respectively. The decision of relieving him from payment of penalties assessed because he committed negligence or intentionally ignored the applicable legal provisions is also challenged.

## I

### *Year 1943*

 The taxpayer had no bookkeeping entries at hand on the date of the investigation because they had been misplaced or he had destroyed them after a previous investigation had been accomplished by the Income Tax Bureau in relation to the years 1944 and 1945. In view of this fact, the Secretary, employing the net worth method, determined that Vilanova had a net capital of $57,032.47 on August 15, 1943,[1] and after having deducted the net income of $5,010.63 earned according to his return and after making several adjustments, he charged him with unreported income for the amount of $51,516.80.

For a better understanding of the controversy, we copy below a report in order to show exactly how the Secretary made his determination:

*"Net Capital on 8-15-43:*

*Assets*

| | | |
|---|---:|---:|
| Cash in Banks | | $ 1,799.64 |
| Inventory of Merchandise | | 39,419.27 |
| Accounts Receivable | | 10,065.52 |
| Lot—Borinquen Ave. | $ 7,678.53 | |
| Building—Borinquen Ave. | 11,146.67 | |
| | $18,825.00 | |
| Less: Reserve for Depreciation | 130.04 | 18,694.96 |
| Office Furniture | | 1,160.60 |
| Automobile and Truck | $ 3,020.00 | |
| Less: Reserve for Depreciation | 66.67 | $ 2,953.33 |
| | | $74,093.32 |

---

[1] The taxpayer filed his income tax return for the fiscal years ending on August 15.

LIABILITIES AND NET WORTH

*Liabilities:*

Loan to be Paid:

| | |
|---|---:|
| Jefferson Standard Life Isurance | $ 3,380.00 |
| Promissory Notes to Bearer | 10,000.00 |
| Royal Bank of Canada—Santurce | 3,500.00 |
| Income Tax Reserve | 180.85 |
| | |
| Total Liabilities | $17,060.85 |

*Capital*

| | | |
|---|---:|---:|
| Profits Not Taken | $ 2,829.78 | |
| Profit Increased by Investigation | 54,202.69 | |
| | | $57,032.47 |
| | | $74,093.22 |

*Unreported Income*

Were determined as follows:

| | | |
|---|---:|---:|
| Net Capital on 8-15-43 | | $57,032.47 |

Less:

| | | | |
|---|---:|---:|---:|
| Net income according to return | | $5,010.63 | |
| Less: | | | |
| Personal | | | |
| Expenses | $2,000.00 | | |
| Income Tax | 180.85 | | |
| | | 2,180.85 | |
| | | $2,829.78 | |
| Plus: Adjustments deductions item | | 2,685.89 | 5,115.67 |
| | | | |
| Net Worth Increase (Unreported Income) | | | $51,516.80" |

Section 14 (b) of the Income Tax Act of 1924 (13 L.P.R.A. § 693 (*b*)), provides that if a taxpayer employs no method of accounting, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Secretary of

the Treasury clearly reflects the income.[2] One of the methods used in these cases in order to determine the taxable income in a specific taxable period is the net worth method.[3] *Jaeger Motor Co.* v. *Commissioner*, 284 F.2d 127 (C.A. 7, 1960) ; *Vise* v. *Commissioner*, 278 F.2d 642 (C.A. 6, 1960) ; *Schultz* v. *Commissioner*, 278 F.2d 927 (C.A. 5, 1960) ; *Holt* v. *United States*, 272 F.2d 272 (C.A. 9, 1959).

This method relies on the inference that an increase in the taxpayer's net worth in a determined period is due to income earned during that period,[4] that is, an additional income is established through indirect or circumstantial evidence. *Schultz* v. *Commissioner, supra; Davis* v. *Commissioner*, 239 F.2d 187 (C.A. 7, 1956) ; *Dupree* v. *United States*, 218 F.2d 781, 785 (C.A. 5, 1955). Hence, it is necessary to fix adequately an opening net worth as well as a closing net.

---

[2] This section corresponds to § 41 of the Income Tax Act of 1954 in effect (13 L.P.R.A. § 3041).

[3] The other two main methods employed in order to determine the income when a taxpayer employs no method of accounting or when the method employed is inadequate or does not clearly reflect the income, are the following: (a) the percentage method or recomputation of gross sales which consists in determining the taxable profit by fixing a percentage—generally an average of benefits obtained by similar businesses—over the proceeds of the gross profits; (b) the bank deposit method, whereby the bank deposits shall be considered as taxable income except those which may be attributed to or identified as coming from sources which are not taxable, such as redeposits, transfers, loans, etc.

There are other varieties of methods we need not set forth now. See, *Suspicion Versus Conviction in the Commissioner's Computation of Income : The Adequacy of Records Under Section 41 of the Internal Revenue Code*, 98 U. Pa. L. Rev. 563 (1950). However, we wish to set forth that it is up to the Secretary of the Treasury to select the method in order to determine the taxable income of the taxpayer who can not insist in the employment of any particular method. *Schellenbarg* v. *Commissioner*, 31 T. C. 1269 (1959) ; *United Dressed Beef Co.* v. *Commissioner*, 23 T. C. 879 (1955) ; *Morris Miller* v. *Commissioner*, T. C. Memo. 1955–112.

[4] *Holland* v. *United States*, 348 U.S. 121 (1954) ; *Thomas* v. *Commissioner*, 232 F.2d 520 (C.A. 1, 1956) ; *United States* v. *Ford*, 237 F.2d 57 (C.A. 2, 1956) ; *Clark* v. *Commissioner*, 253 F.2d 745 (C.A. 3, 1958) ; *Bond* v. *Commissioner*, 232 F.2d 822 (C.A. 4, 1956) ; *Estate of Phillips* v. *Commissioner*, 246 F.2d 209 (C.A. 5, 1957) ; *Blackwell* v. *United States*, 244 F.2d 423 (C.A. 8, 1957).

worth, since the difference between both is what presumably reflects the income of the period. In practice, other factors are also considered and an adequate formula in order to set forth the computation determining the taxable income would be to consider as minuend the net worth and expenses at the end of the taxable year, and the opening net worth and the reported income as the subtrahend.[5] The result would be the unreported income.[6]

Now then, in order that the net worth method may be applied to determine the taxable income, the taxpayer's open-ing net worth must be clearly and accurately established by competent evidence. *Holland* v. *United States*, 348 U.S. 121 (1954) ; [7] *Cefalu* v. *Commissioner*, 276 F.2d 122 (C.A. 5, 1960), where it is clearly stated that the opening net worth need not be arrived at with mathematical certainty; *Clark*

---

[5] Expressed in terms of a mathematical formula it would be as follows:

The final Net worth plus Expenses, less opening Net worth plus reported Income = Unreported income.

See, *The Net Worth Audit Problem and How to Meet It*, 35 Iowa L. Rev. 432 (1950) ; *The Defense of a Criminal Net Worth Tax Case*, 41 Cornell L. Q. 106 (1955).

[6] Unreported income and unidentified income are not synonymous terms even though in practice they have been indistinctly used. However, they have certain similarities and, when considered from the position in which the Secretary's determination places the taxpayer, the process of con-firming by the same is very similar. As to unidentified income, see, *Collazo* v. *Secretary of the Treasury*, 82 P.R.R. 629 (1961); *Vilanova* v. *Secretary of the Treasury*, 78 P.R.R. 768 (1955); *Garcia* v. *Secretary of the Treasury*, 76 P.R.R. 471 (1954).

[7] The Supreme Court of the United States gave its definite approval to the net worth method in order to sustain a conviction for income tax evasion in the *Holland* case. For commentaries on this leading case in the matter, see, *The Holland Case-Analysis*, 35 Taxes 224 (1957) ; *Net Worth and Proof of Tax Evasion*, 4 De Paul L. Rev. 237 (1955). Au-thorities on the net worth method have developed for the most past as to criminal prosecutions for fraud and income tax evasion, but the prin-ciples set forth in these cases are equally applicable in civil suits. In *Thomas* v. *Commissioner*, 232 F.2d 520, 524 (C.A. 1, 1956), it is stated that "despite the difference between the burden of proof in a criminal case and that in a civil determination of tax deficiency . . . we see no reason why the determination of opening net worth should be any less vital to the validity of the method of computation invoked in the one type of case than in the other."

v. *Commissioner*, 253 F.2d 745 (C.A. 3, 1948); *Gariepy* v. *United States*, 189 F.2d 459 (C.A. 6, 1951); *United States* v. *Fenwick*, 177 F.2d 488, 490 (C.A. 7, 1949); *Bryan* v. *United States*, 175 F.2d 223 (C.A. 5, 1949); *United States* v. *Chapman*, 168 F.2d 997 (C.C.A. 7, 1948). The Secretary's determination of the taxpayer's net worth should be based on reasonable grounds and not on mere guesswork, *Polizzi* v. *Commissioner*, 265 F.2d 498 (C.A. 6, 1959), since the establishment of the accuracy of the opening net worth is a question subject to judicial review in order to determine whether it is clearly erroneous, *Veino* v. *Fahs*, 257 F.2d 364 (C.A. 5, 1958); *Estate of Phillips* v. *Commissioner*, 246 F.2d 209 (C.A. 5, 1957). In *Rubino* v. *Commissioner*, 226 F.2d 291 (C.A. 6, 1955), income tax deficiencies were determined against a taxpayer based on premises that taxpayer had a zero net worth; but when taxpayer was not shown to have had a zero net worth as of that date, the deficiencies were set aside. See, *Rubino* v. *Commissioner*, 249 F.2d 444 (C.A. 6, 1957); *Descos* v. *Commissioner*, 10 T.C.M. 270 (1951). Spurgeon Avakian, a renowned authority on tax litigation in cases of fraud, qualifies the establishment of the opening net worth as the government's *"most important obligation"* to establish a case on the basis of the net worth method.[8]

The net worth alone is not sufficient to be attributable to taxable income earned during a specific period. Proof of a likely source of income, from which it may be reasonably found that the net worth sprang, is necessary. *Holland* v. *United States*, 348 U.S. 121, 137–38; *Thomas* v. *Commissioner*, 232 F.2d 520 (C.A. 1, 1956); *cf. United States* v.

---

[8] Avakian, *Current Development in Net Worth Method of Establishing Fraud,* So. Calif. Tax Inst. 605, 609 (1957). See also, Avakian, *Net Worth Computation as Proof of Tax Evasion,* 10 Tax L. Rev. 431, 439 (1955).

For other defenses of the taxpayer in order to disprove the administrative determination grounded in the employment of the net worth method, see, Balter, Fraud Under Federal Tax Law 315–319, 2d ed., 1953.

*Massei*, 355 U.S. 595 (1958); Avakian, *op cit.* at 619; Burns and Rachlin, *Trial by Net Worth*, 33 Taxes 121, 122 (1955).

Since taxpayer Vilanova had no accounting records on hand at the time of the investigation, the Secretary of the Treasury could employ the net worth method in order to determine the taxable income during the year 1942–43. He attempted to do so but, in our opinion, committed manifest error in premising that the latter had a zero net worth on August 15, 1942 and in establishing the net worth at the end of the taxable year (August 15, 1943) by considering therefor the net worth existing in subsequent years and other assets, the acquisition of which could easily be justified on a previous date or that they did not belong to the taxpayer. He did not make any reasonable effort either to determine the existing liabilities at the beginning of the taxable year. The language used to explain the scope of § 41 of the Federal Act of Internal Revenue seems to be applicable to this case: "Congress never intended to make Section 41 a set of glasses equipped with bi-focal lenses to permit the Commissioner to see only what he desires to see; to permit him to shift from the upper to the lower portion of the lense to avoid an embarrassing net worth picture of his own making." Byer, *Net Worth and Civil Liability*, Proc. N.Y.U. 17th Ann. Inst. Fed. Taxation 67 (1959). The impression we have obtained from the analysis of the evidence is that the officer who practiced the investigation chose not to inquire into this matter, and in building a net worth grounded upon incomplete facts he relied on the fact that based on the presumption of correctness of administrative determinations, defendant would be obliged to supply the necessary information which, as we shall see, was accessible to said investigator. Once more the presumption of correctness has been considered as a talisman which averts all errors that may have been committed in the administrative determination. Even though

the above-mentioned presumption is extended to those cases wherein the Secretary has determined the taxable income by using the net worth method, this determination disappears when it appears on its own face that it is manifestly erroneous or arbitrary or capricious, *Thomas* v. *Commissioner*, 232 F.2d 520 (C.A. 1, 1956); Balter, *Rules of Evidence Applicable in Proceedings Before the Tax Court of the United States: Burden of Proof and Presumptions* 23; and it has been specifically held that the presumption of correctness is not applicable in these cases when grounded on mere guesswork, *Polizzi* v. *Commissioner*, 265 F.2d 498 (C.A. 6, 1959); *Shahadi* v. *Commissioner*, 266 F.2d 495 (C.A. 3, 1959); Proc. N.Y.U. 18th Ann. Inst. Fed. Taxation 1051–1052 (1960). It has been insinuated that in these cases the presumption of correctness does not have the same force. *Gunn* v. *Commissioner*, 247 F.2d 359, 362 (C.A. 8, 1957); *cf. Carrión* v. *Treasurer of Puerto Rico*, 79 P.R.R. 350, 364 (1956); *Hormazabal* v. *Secretary of the Treasury*, 79 P.R.R. 209 (1956).

A mere glance at the manner in which the investigator determined the taxpayer's net worth in 1943 is sufficient to convince us that it does not meet the requirements of the least exacting court. The corresponding report reads as follows:

*Assets*

| | | |
|---|---|---|
| Cash in banks | | $1, 799. 64 |
| Inventory of merchandise: | | |
| At the beginning: income tax return, year 1944 | | 39, 419. 27 |
| Accounts receivable: | | |
| income tax return, year 1944 | | 10, 065. 52 |
| House and lot at Borinquen Ave., corner of Street 15, according to deed No. 5, executed in San Juan on January 5, 1943 | $18, 825. 00 | |
| Less: | | |
| Reserve for depreciation | 130. 04 | 18, 694. 96 |

| | | |
|---|---:|---:|
| Office furniture: According to Income tax return for 1944 | | 1,160.60 |
| Automobile and truck: According to income tax returns for 1944 and 1945 | $3,020.00 | |
| Less: Reserve for depreciation | 66.67 | 2,953.33 |
| | | $74,093.32 |

### Liabilities

| | |
|---|---:|
| Jefferson Standard Life Insurance Co. | 3,380.00 |
| Promissory notes to the bearer—deed No. 5 of January 5, 1943 before notary Angel A. Vázquez Sánchez | 10,000.00 |
| Royal Bank of Canada, Santurce | 3,500.00 |
| Total | $16,880.00 |

The evidence shows that on June 18, 1936, Juan Vilanova Pagán and José María Arias established a general business partnership which did business under the firm name of "Vilanova y Compañía" to which Juan A. Vilanova Díaz was subsequently incorporated as an industrial partner; that on February 14, 1942, Juan Vilanova Pagán transferred to appellee Adolfo Vilanova Mayén, for the amount of $5,000 which was acknowledged as received before the execution, his share in the above-mentioned partnership; that on October 10 of the same year, appellee acquired Arias' and Vilanova Díaz' shares for the amounts of $176.70 and $117.80, which he paid at the execution, thereby becoming the sole owner of the hardware business of the partnership; that the partnership had acquired a lot and building located on Borinquen Avenue, Barrio Obrero, which formed part of the assets of the partnership which were conveyed to appellee[9] and which were

---

[9] Although by deed No. 137 of October 6, 1942 before notary Angel A. Vázquez, the lot and building were conveyed to Dominga Díaz, and thereafter by deed No. 5 of January 5, 1943, Vilanova, at that time the sole owner of the business, personally reacquires it for the same price which had been involved in the former sale, this transaction was satisfactorily

appraised at that time at $11,016.43;[10] that since the commencement thereof the partnership operated its business principally on the basis of credits issued by banks and by the supplies of merchandise and that this commercial practice continued after Vilanova had acquired the business; that by deed No. 371 of July 23, 1946, before notary Angel A. Vázquez, one of the taxpayer's sons named Adolfo Vilanova Díaz, bought a lot adjacent to the one to which we have previously referred, and which was conveyed to appellee's wife on December 4, 1947;[11] that the partnership of Vilanova & Company had merchandise appraised on August 15, 1942 at $28,081.16, accounts receivable for the amount of $2,718.42, and accounts payable for $25,151.07; and finally, that appellee had no other businesses during the taxable year than that acquired from the partnership.

From the foregoing it clearly appears that the Secretary's determination of the taxpayer's net worth for the year ending on August 15, 1943 can not be sustained. Not only is it erroneous on its face for the above-mentioned reasons,[12] but

explained as a simulated sale in order to obviate certain difficulties in relation to the conveyance to Vilanova of the interests of member Arias, whose wife was apparently opposed to selling her share in the partnership. It is significant that the sale made to Dominga Díaz preceded the conveyance from Arias to Vilanova by only two days. Besides, the evidence as to the simulated nature of the transaction was not challenged at all. We deduct, therefore, that Vilanova made no special investment in order to acquire this real estate in 1943, since it formed part of the assets of the business which he had acquired for the total sum of $5,294.50. If the building was worth the above-mentioned sum of $11,016.43, in all probability the accounts payable of the firm exceeded the inventories and accounts receivable.

[10] The value attributed to this real property was $11,146.47, but the reserve for depreciation of $130.04 having been deducted, the net value is reduced to $11,016.43.

[11] This lot was appraised in the report of assets previously transcribed at $7,678.56. It seems obvious that if the taxpayer did not acquire it until 1947, it could not be considered as an element of his patrimony in 1943.

[12] The Secretary did not determine opening net worth on August 15, 1942, although it was shown that Vilanova made investments, and among them, that of buying the assets of the partnership of Vilanova & Company. Cf. *Rubino* v. *Commissioner*, 226 F.2d 291 (C.A. 6, 1955).

the taxpayer destroyed any traces of effectiveness which might have remained in the presumption of correctness palpably showing the impossibility that he could have had additional income for the aforesaid amount of $51,516.80. It is true that the hardware business constitutes the possible source of income which must be established in these cases wherein the net worth method is employed in order to establish the net worth increase, but we cannot ignore that if anything was proved beyond a reasonable doubt was the fact that the taxpayer's business, operating on a credit basis, gradually obtained an ascending scale of profits as it is hereafter pointed out,[13] and that an additional income of $51,516,80 could hardly have been produced in 1942–43 on the basis of the assets and liabilities of taxpayer's business as it was proved by the income report for 1941–42 of Vilanova & Company:[14]

| 1943 | $ 5,010.63 | 1946 | $20,561.76 |
| 1944 | 10,324.98 | 1947 | 39,232.31 |
| 1945 | 15,414.25 | 1948 | 28,058.75 |

## II

### Year 1946

For the year 1946 the Secretary determined unreported income of $8,807.14 through the net worth method as follows:

---

[13] The years 1944, 1945, and 1947 were investigated by the Secretary.

[14] The report on Vilanova & Company's situation on August 15, 1942 was the following:

| Assets | | Liabilities | |
|---|---|---|---|
| Cash | $ 398.71 | Debts to be paid | $ 8,749.00 |
| Merchandise | 28,081.16 | Bills to be paid | 25,151.07 |
| Furniture, etc. | 987.84 | Net worth | 10,072.95 |
| Accounts Receivable | 2,718.42 | Profit | 707.42 |
| Automobile-Truck | 880.00 | | |
| Building | 11,614.31 | | |
| | $44,680.44 | | $44,680.44 |

| | |
|---|---|
| Net worth on August 15, 1946 | $94,544.15 |
| Less: Net worth on August 15, 1945 | —77,012.20 |
| Increase in net worth | $17,531.95 |
| Less: Profit reported during the year 1945–46 available to the taxpayer | 8,694.81 [15] |
| Unreported income | $ 8,837.14 |

The notice contained a report of the taxpayer's assets and liabilities on August 15, 1945,[16] and on August 15, 1946,[17]

---

[15] According to the return filed by the taxpayer, his net income for the year ending on August 15, 1946 amounted to $20,561.76. The income tax amounted to $4,870.32 and he withdrew $6,996.63 for personal expenses. The net income available for capitalization was therefore, $8,694.81.

[16] The report on August 15, 1945 is as follows:

ASSETS

| | | |
|---|---|---|
| A—Cash in Banks | | $14,231.62 |
| United States Defense Bonds | | 2,935.50 |
| B—Accounts Receivable | | 28,049.23 |
| B—Inventory of Merchandise | | 40,680.64 |
| C—Lots | | 8,602.53 |
| D—Buildings | $25,186.61 | |
| Less: Reserve for depreciation | 840.58 | 24,346.03 |
| E—Office Furniture | $ 1,382.50 | |
| Less: Reserve for depreciation | 232.05 | 1,150.45 |
| G—Motor Vehicles | $ 3,320.00 | |
| Less: Reserve for depreciation | 791.33 | 2,528.67 |
| Total Assets | | $122,524.67 |

LIABILITIES AND NET WORTH

| | | |
|---|---|---|
| *Liabilities:* | | |
| Income tax | $ 2,472.47 | |
| F—Loans to be paid | 43,040.00 | $45,512.47 |
| *Net Worth:* | | |
| Adolfo Viianova Mayén | | 77,012.20 |
| Total Liabilities and Net Worth | | $122,524.67 |

[17] The report on August 15, 1946 is as follows:

ASSETS

| | | |
|---|---|---|
| *Liquid:* | | |
| Cash | $ 1,044.41 | |
| Bank Accounts | 5,519.19 | |

in order to determine the opening net worth and the closing net worth. The trial court set aside the deficiency on the ground that the increase pointed out in the net worth was the result of "investments from savings accumulated during several years by the taxpayer." It referred undoubtedly to the net profits obtained in 1944 and 1945, which amounted to $10,324.98 and $15,414.25.[18] However, it seems clear that these profits must be reflected somehow in the statement employed in orded to establish the opening net worth on August 15, 1945, either forming part of the cash on hand or in banks, or through reinvestments in the business. If that was not the real situation, *it was up to the taxpayer* to show that the report was inadequate and that his assets at the beginning of the tax year were greater. We have carefully examined the evidence introduced and contrary to the situation in the

| | | |
|---|---|---|
| Accounts Receivable | 46,299.41 | |
| Inventory of Merchandise | 42,709.43 | |
| Advances on Purchases | 20,530.79 | |
| United States Defense Bonds | 2,935.50 | |
| | | $119,038.73 |

*Fixed:*

| | | | |
|---|---|---|---|
| Land Tenements | | 13,602.53 | |
| Buildings | $25,186.61 | | |
| Less: Reserve for depreciation | 1,344.31 | 23,842.30 | |
| Furniture and fixtures | 3,299.50 | | |
| Less: Reserve for depreciation | 382.05 | 2,917.45 | |
| Motor Vehicles | 4,398.80 | | |
| Less: Reserve for depreciation | 913.29 | 3,485.51 | |

| | |
|---|---|
| Total Fixed Assets | $ 43,847.79 |
| Total Assets | $162,886.52 |

[18] It is necessary to remember that from these amounts the income taxes paid and a reasonable sum for personal expenses must be deducted.

year 1943, we do not find that appellee destroyed the presumption of correctness of the administrative determination. Nor does it appear on its face that it is capricious or unreasonable.[19] Under these conditions we believe that the presumption of correctness should prevail. *Friedberg* v. *United States*, 348 U.S. 142 (1954) ; *Smith* v. *United States*, 348 U.S. 147 (1954) ; *United States* v. *Skidmore*, 123 F.2d 604 (C.C.A. 7; 1941) ; *United States* v. *Chapman*, 168 F.2d 997 (C.A. 7, 1948).

As we pointed out previously, the net worth method to determine the net income has been generally employed when the taxpayer employs no bookkeeping method, or when the latter does not clearly reflect the income. Before 1954, it was held that such method could not be used when the books were adequate. *United States* v. *Riganto*, 121 F. Supp. 158 (Va. 1954) ; *United States* v. *Williams*, 208 F.2d 437 (C.A. 3, 1953) ; *Remmer* v. *United States*, 205 F.2d 277 (C.A. 9, 1953) ; *Hooper* v. *United States*, 216 F.2d 684 (C.A. 10, 1954) ; *Whittermore* v. *Commissioner*, 7 T.C.M. 845 (1948) ; *Glackman* v. *Commissioner*, 10 T.C.M. 1132 (1951), wherein it was stated that unless the books are inadequate or incomplete, burden is upon government to introduce some other evidence in order to sustain the inference of the existence of unreported income. The matter seems to have been definitely decided in the opinion delivered by the Supreme Court of the United States in the *Holland* case, which established that said method could be employed even when the books were correct,

---

[19] In the net worth report on August 15, 1946 the investigator employed a report of the investigation practiced by accountant Juan C. Villariny "for the year 1949" insofar as it refers to the items of office furniture ($3,299.50) and motor vehicles ($4,398.80) which appear in the assets. Although there is a possibility that these items were unduly included, that is, in excess of the real value attributable on said date, we find that the report in question was not offered in evidence and we are precluded from making a proper verification. In any event, any error in this sense would only produce the corresponding adjustments, but not the nullity of the whole deficiency.

on their face, since it was not, strictly speaking, a question of an accounting system. Any other interpretation would lead to reward the consistency of a bookkeeping method, instead of the truthfulness thereof. See, Anno., *Use of net worth method in prosecution for evasion of federal income tax*, 99 L. Ed. 167, 171 (1954).

As to the taxable year of 1946, the Secretary could determine the net income of the taxpayer by employing the net worth method, despite the fact that the latter kept books. In the absence of a satisfactory explanation, and although this method has been labeled as speculative when the difference between the taxpayer's report and the administrative determination is not substantial, *Sasser* v. *United States*, 208 F.2d 535; *United States* v. *Schenck*, 126 F.2d 702 (C.C.A. 2, 1942), it should prevail because the presumption has not been controverted by competent evidence.

### III

#### Year 1948

■ Since due to certain bookkeeping entries made in 1949 and effective on August 15, 1948, the "Net Worth" statement was increased by $19,964.11, the Secretary determined that the taxpayer had unreported income for the same amount on said taxable year. The entries of $2,196.86 and $17,767.25 were charged to "Pending Accounts" and "Accounts Payable." The taxpayer's position is that this amount exclusively represents bookkeeping entries corresponding to readjustments of previous years and which in no manner whatsoever constitutes taxable income during the year 1948, although the net worth was increased.

The evidence presented reveals that the readjustment of $17,767.25 was due to a difference between the balance in the books of accounts payable and the real balance of accounts payable. In 1948 the ledger showed a balance of $71,041.99, but through effective attestation with the creditors it came out to be only $53,274.74. The employee who made the en-

tries in the books specifically testified that these adjustments were due to errors committed in the previous years 1944, 1945, 1946, and 1947, and he pointed out as an example certain entries made in relation with a credit in favor of Earl K. Burton, Inc., and certain charges in the account of "Advances to Suppliers." As to the adjustment in the "Pending Accounts" for $2,196.86, he indicated that it was due to the difference between the debit and the credit at the close of the commercial operations in the year 1947–48. He did not specifically point out the entries responsible for the difference because due to the investigation which was practiced by the Income Tax Bureau, he did not have sufficient time. Meanwhile—and until the origin of the discrepancy was determined, whether it was due to an expense account or a capital account—the same was charged in the above-mentioned manner.

In our opinion, the evidence presented by the taxpayer, which remained uncontroverted, plainly showed that the latter did not have the additional income attributed to him in this taxable year and the net worth increase was rather due to mere bookkeeping entries in order to correct the differences of *previous years*. We are aware of the fact that there is a possibility that by virtue of the conclusion we have reached, income earned by the taxpayer may escape taxation, but it is not for us to determine now whether it was appropriate to include them in the return of those previous years, nor the consequences of the failure to do so.[20] We deem as applicable here our ruling in the case of *Loíza Sugar Co.* v. *Domenech*, 44 P.R.R. 536, 542 (1933) to the effect that "the government cannot invent income on the basis of errors in the manner in which the taxpayer carries his books, as the

---

[20] Any error regarding income prior to 1946 would increase the taxpayer's net worth, and therefore, could explain in part the difference in the net worth which as unreported income gave rise to the deficiency notified for said year, which we shall affirm pursuant to the discussion appearing in Part II of this opinion.

determination of the net taxable income rests on actual facts and not on theories, technicalities or bookkeeping entries." See, *D. Velasco & Co.* v. *Sancho, Treas.*, 51 P.R.R. 54, 56 (1937) ; *cf. Cooper-Brannan Naval Stores Co.*, 9 B.T.A. 105 (1927). In Mertens, *op. cit*, § 5.09, the applicable rule is set forth in very precise terms: "The real facts, not book-keeping entries, control the determination of taxable income."

As to the five per cent penalty due to "negligence or intentional disregard of rules and regulations," we believe that due to the circumstances surrounding the determination of the deficiency, this is not the appropriate case for its imposition. The taxpayer made a return grounded on his book-keeping entries. The increase in the taxable income was not due to deliberate errors in the preparation of his return. *P. R. Telephone Co.* v. *Sec. of the Treas.*, 79 P.R.R. 845, 888 (1957) ; Mertens, *op. cit.*, § 55.25.

In view of the foregoing, the judgment rendered by the Superior Court, San Juan Part, shall be modified in the sense that the taxpayer had unreported income in the year 1946 for $8,837.14 and as modified, it is affirmed.